**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|                          |   |                               |
|--------------------------|---|-------------------------------|
|                          | : |                               |
| DERRON B., et al.,       | : |                               |
|                          | : | Civil Action No. 20-3679 (JMV)|
| Petitioner,              | : |                               |
|                          | : |                               |
| v.                       | : | **OPINION**                   |
|                          | : |                               |
| JOHN TSOUKARIS, et al.,  | : |                               |
|                          | : |                               |
| Respondents.             | : |                               |
|                          | : |                               |

---

**VAZQUEZ, District Judge:**

This matter originated with a Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241.  Presently pending before the Court are Petitioners' Elmer R.M.,[1] Everod R., Bairon J. G.M., and Erlin P.M. ("Petitioners") habeas petition and motion for order to show cause for a temporary restraining order ("TRO").  D.E. 1, 16, 17.  For the reasons detailed below, the Court will deny the motion for a TRO.

The filing initially included additional Petitioners, Derron B., Darwin O.A. H., Efrain R.G., and Carlos G.L, who have since been released by the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE").  Because those Petitioners have been released, their request for a T.R.O. is denied without prejudice as moot.

---

[1] Petitioners are identified herein only by their first name and the first initials of their surnames in order to address certain privacy concerns associated with § 2241 immigration cases.   This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.  For ease of reading, the Court at times refers to Petitioners only by their first names.

## I.    Background

Petitioners are immigration detainees being held by ICE at the Hudson County Correctional Facility ("HCCC") in Kearny, New Jersey and the Bergen County Correctional Facility ("Bergen County Jail") in Hackensack New, Jersey.   The instant motion was filed in the wake of the ongoing COVID-19 pandemic,[2] that has been reported to have been contracted by both personnel and inmates at the Hudson County and Bergen County Jails.[3]

Each Petitioner submits that he is either experiencing symptoms consistent with COVID-19 or has tested positive for COVID-19.

### Elmer R.M.

Elmer R.M., who is twenty-five years old and detained at Bergen County Jail, submits that he has exhibited COVID-19 symptoms such as fever, difficulty breathing, and coughing up blood.   D.E. No. 16 at 5.   Elmer is a native and citizen of Guatemala who is subject to discretionary detention under 8 U.S.C. § 1226(a).   D.E. 20-7 at 3, 7.   On February 6, 2020, Elmer was served with a notice to appear by DHS charging him with remaining in the United States for a time longer than permitted under the Immigration and Nationality Act ("INA") § 237 (a)(1)(B).   *Id.* at 3.   On February 2, 2020, Elmer was arrested for assault.   D.E. 20-8 at 3.   That case is pending.   *Id*

---

2 COVID-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020.  *See* Centers for Disease Control and Prevention *Coronavirus Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/ (last visited Apr. 7, 2020).

3 Monsy Alvarado, *A running list of positive coronavirus cases at county jails in North Jersey*, https://www.northjersey.com/story/news/new-jersey/2020/04/06/coronavirus-list-positive-cases-county-jails-north-jersey/2958115001/ (last visited Apr. 24, 2020).

**Everod R.**

Everod R., who is forty-nine years old and detained at HCCC, initially submitted that he was exhibiting symptoms consistent with COVID-19 such as a dry cough and difficulty breathing. *Id.* at 5.   On April 17, 2020, Everod tested presumptively positive for COVID-19.   D.E. 26 at 5.

Everod is a native and citizen of Jamaica who is subject to mandatory detention under 8 U.S.C. § 1226(c).   D.E. 20-5 at 3.   Everod was convicted of federal firearm offenses in 1995, possession and distribution of a controlled substance in violation of New Jersey state law in 2000, and of narcotics possession with intent to sell in violation of New York state law in 2018.   *Id.* at 4.   Everod was deported to Jamaica in 2005, and he re-entered the United States on an unknown date thereafter.   *Id.*   In 2007, Everod was once again ordered removed to Jamaica, however the Board of Immigration Appeals ("BIA") vacated the decision and remanded proceedings.   *Id.* While the matter was pending,[4] Petitioner was arrested in 2018 and subsequently convicted for a narcotics offense in New York State court, resulting in DHS charging him with removability pursuant to the most-recent drug trafficking offense.   *Id.*   On March 11, 2020, an Immigration Judge ("IJ") convened a bond hearing and ultimately denied Everod's request for a change in custody status, finding he posed a danger to the public at large citing to his numerous rearrests following previous release on bond by prior IJ's.   *Id.* at 7-8.

**Bairon G.M.**

Bairon G.M. is twenty-two years old and is detained at the HCCC.   D.E. 16 at 5.   He submits that he has exhibited symptoms consistent with COVID-19 such as chills, swollen and red eye, body pain, dizziness and a runny nose.    *Id.* at 5-6.

---

4 The immigration matter was adjourned numerous time over the course of approximately seven years.   D.E. 20-5 at 4.

Bairon is a native and citizen of El Salvador and is subject to discretionary detention under 8 U.S.C. § 1226(a).   D.E. 25-3 at 3, 6.   On September 27, 2019, Bairon was served a notice to appear charging him as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General.   *Id.* at 3.   On August 12, 2019, Bairon was arrested for burglary and violation of a court order.   D.E. 25-1 at 1.   Those charges are currently pending.   *Id.*   Bairon was previously convicted of disorderly conduct in 2019.   *Id.* at 2.   On March 30, 2020, an IJ denied Bairon's request for change in custody status.   D.E. 25-4 at 2.

### Erlin P.M.

Erlin P.M. is eighteen years old and detained at HCCC.   D.E. 16 at 6.   He initially submitted that he was exhibiting symptoms consistent with COVID-19 such as fevers, body aches, coughing, and headaches.   *Id.*   On April 17, 2020, Erlin tested positive for COVID-19.   D.E. 26 at 4.   Erlin argues that he was not treated after being informed of his COVID-19 positive test result and he was not provided information about the virus such as, warning signs that could indicate complications or mental health care to address the possible anguish he could experience, as a result of learning of being infected coupled with his young age and life history.   D.E. 28 at 8.

Erlin is a native and citizen of El Salvador and is subject to discretionary detention under 8 U.S.C. § 1226(a).   D.E. 25-8 at 4.   On April 5, 2017, Erlin was served a notice to appear, charging him as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. D.E. 25-7 at 2.   In November 2018, Erlin was arrested by ICE for violating the terms of his release from Office of Refugee Resettlement ("ORR") custody, by no longer living with his sponsor. D.E. 25-8 at 3-4.   After being placed back in ORR custody, Erlin was arrested on December 11,

4

2018, for assault in the third degree in violation of New York state law. *Id.* at 4. He was adjudicated as a youth offender. *Id.* He was placed in ICE custody on May 12, 2019, and subsequently filed an application for asylum pursuant to INA § 208(a)(1), withholding of removal pursuant to INA § 241(b)(3), and protection pursuant to the U.N. Convention Against Torture ("CAT"), 8 C.F.R. § 1208.16(c), § 1208.(a). *Id.* On November 7, 2019, an IJ denied Erlin's application for asylum under INA § 208(a), application for withholding of removal under INA § 241(b)(3), application for protection under CAT and ordered him removed to El Salvador pursuant to the charges in the notice to appear. *Id.* at 21-22.

On April 2, 2020, Petitioners, Elmer R.M., and Everod R. along with three other petitioners whose have since been released from detention, filed a petition for writ of habeas corpus challenging their immigration detention and the conditions of their confinement pursuant to 28 U.S.C. § 2241 in the United States District Court for the Southern District of New York. D.E. 1. On March 24, 2020, District Judge Edgardo Ramos of the Southern District of New York signed a stipulation and order of transfer of venue and the matter was transferred to this Court. D.E. 4. On April 12, 2020, Petitioners filed a motion for order to show cause for preliminary injunction and temporary restraining order. D.E. 17. The motion added three petitioners, Bairon G.M., Erlin P.M., and Efrain R.G.[5] D.E. 23. In their motion, Petitioners ask the Court to order them released in the wake of the ongoing COVID-19 pandemic,[6] that has been reported to have been

---

5 Efrain R.G. has since been released from custody. D.E. 23.

6 COVID-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020. *See* Centers for Disease Control and Prevention *Coronavirus Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-

contracted by both HCCC and Bergen County Jail personnel and inmates.[7]   D.E. 16.   In addition to their immediate release, Petitioners ask the Court to enjoin Respondents from moving them from the New York City area and to order Respondents not to re-detain them pending the culmination of all removal proceedings against them.   *Id.* at 40-41.   Petitioners also requests reasonable costs and attorney fees pursuant to the Equal Access to Justice Act "EAJA."

On April 15, 2020, the Court convened a telephonic hearing with the parties to hear arguments.   D.E. 23.   After the hearing, Petitioners Everod R. and Erlin P.M. tested positive for COVID-19.   D.E. 26.   Bairon G.M. tested negative.   *Id.*; D.E. 31.

## A.  COVID-19

The COVID-19 pandemic is at the heart of this case.   Judge John E. Jones III, in a thoughtful opinion, described the situation as follows:

> In a matter of weeks, the novel coronavirus COVID-19 has rampaged across the globe, altering the landscape of everyday American life in ways previously unimaginable. Large portions of our economy have come to a standstill. Children have been forced to attend school remotely. Workers deemed 'non-essential' to our national infrastructure have been told to stay home. Indeed, we now live our lives by terms we had never heard of a month ago—we are "social distancing" and "flattening the curve" to combat a global pandemic that has, as of the date of this writing, infected 719,700 people worldwide and killed more than 33,673. Each day these statistics move exponentially higher.

*Thakker v. Doll*, Civ. Docket No. 20-cv-480,   - F. Supp. 3d -, 2020 WL 1671563, *2 (M.D. Pa. Mar. 31, 2020) (footnotes omitted).   Judge Jones accurately pointed to the swift growth of cases.

---

disease-covid-19/ (last visited April 7, 2020).

7 Monsy Alvarado, *Second ICE detainee in New Jersey tests positive for coronavirus*, Northjersey.com,   https://www.northjersey.com/story/news/new-jersey/2020/03/26/coronavirus-nj-second-ice-detainee-tests-positive-covid-19/2916525001/ (last visited April 8, 2020).

From the date of his opinion (March 31, 2020) to April 26, 2020, the number of worldwide cases and deaths has risen from 719,700 and 33,673 to 2,858,635 and 196,295.[8]

New Jersey has been particularly hard hit, with the northern part of the state bearing the initial brunt.   As of April 26, 2020, New Jersey had 109,038 cases and 5,938 deaths.   *COVID-19 Information Hub*, STATE OF NEW JERSEY, https://covid19.nj.gov/ (last visited April 26, 2020). The total number of cases and deaths for Bergen County, Essex County, and Hudson County, respectively, were 14,965/955, 12,863/1,023, and 13,708/661 deaths.   *Id.*   New Jersey has taken numerous steps, such as the Governor's stay-at-home order issued on March 21, 2020, to combat the virus.   In addition, New Jersey has closed schools indefinitely and closed beaches, state parks, and county parks.[9]

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably between people."   *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html ("*How Coronavirus Spreads*") (last visited April 8, 2020).   The National Institutes of Health reports that the virus "is stable for several hours to days in aerosols and on surfaces[.]"[10]   COVID-19 is "spread mainly from person-to-person."   *Id.*   This person-to-person spread can occur (1) between persons who are in close contact, meaning within six feet,

---

8 *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORGANIZATION, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited April 27, 2020).

9 *New Jersey closes state parks, state forests and county parks as more than 200 new COVID-19 deaths reported*, 6abc, https://6abc.com/covid19-cases-us-coronavirus-symptoms/6083512/ (last visited April 7, 2020).

10 *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces   (last visited April 8, 2020)

and (2) by respiratory droplets when an infected person sneezes, coughs, or talks.  *Id.*   The virus can also be spread by infected persons who are not showing symptoms.  *Id.*

Symptoms of COVID-19 can be mild.  However, the effects of COVID-19 can be drastically more severe in older individuals or those with certain medical conditions, including persons with asthma, lung disease, heart diseases, diabetes, chronic kidney disease, liver disease or those who are immunocompromised.[11]   Besides death, COVID-19 can cause serious, (and potentially permanent) damage to lung tissue, and can require extensive use of a ventilator.   Early evidence suggests that the virus "can damage lung tissue causing a 20 to 30 percent decrease in lung function[.]"  D.E. 1 at ¶ 29 (citation omitted).   In addition, complications from the virus can manifest rapidly.  *Id.*  (citation omitted).   There is currently no vaccine for COVID-19, nor are there known, clinically tested therapeutic treatments.  *Id.* at ¶ 30.   To combat the virus, health officials have emphasized education, social distancing (*i.e.* staying at least 6 feet apart), and improved hygiene.  *Id.* (citation omitted).

**B.  Facility Conditions**

Petitioners argue that the conditions at both HCCC and Bergen County Jail respectively, endanger the lives of all their residents.   They have provided several exhibits containing declarations from recently released ICE detainees, who described their observations and concerns while they were at either one of the facilities.   D.E. 17.   In one declaration, a detainee released on March 26, 2020, provides, that he "was mostly worried about the correctional officers who were coming into the jails but went home every night to their families and communities."   D.E.

---

11 *People Who Are at Higher Risk of Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION,   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 8, 2020).

17-2 at ¶ 17.   Another detainee released from HCCC on March 23, 2020, indicates that "[the HCCC administration] did not take precautions to prevent the virus from arriving, although there were already cases in New Jersey."   D.E. 17-6 at ¶ 13.   A declaration from a detainee released from Bergen County Jail states, among other things, that at the time of his transfer to Bergen County Jail in early March of 2020, the jail staff did not adequately provide any information about COVID-19 prevention, risks, or any other important education.   D.E. 17-3 at ¶¶ 7-8.   He adds that the facility was not adequately cleaned and detainees were not provided adequate cleaning materials.   *Id.* at ¶ 8.

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure. *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/coronavirus (last visited on April 8, 2020).   For example, ICE temporarily suspended all social visitation at detention facilities.   *Id.*   ICE also released approximately 160 individuals who were over the age of 60 or pregnant.   *Id.*   ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 as per CDC guidance.   *Id.*

## HCCC

Respondents submitted a declaration from Ron Edwards, the Director of the HCCC.   D.E. 20-10.   Edwards provides that as of April 20, 2020, ten ICE detainees had tested positive for COVID-19, five of which were released.   *Id.* at ¶ 20.   Twenty-seven county and federal inmates tested positive for COVID-19,[12] as well as eighty-nine staff members, almost half of which are not currently working at the facility.   *Id.*   All staff members who were in proximity of the infected

---

12 Immigration detainees are housed in a separate unit and do not come in contact with the inmates.   Further, separate correctional staff are assigned to the ICE detainees.   D.E. 20-10, ¶ 4.

staff members, were sent home to self-quarantine for a fourteen-day period.   *Id.*

Edwards details the efforts of HCCC to deal with the virus.   Edwards reports that HCCC is currently operating well under capacity and that most immigration detainees are assigned their own cell, which are designed for two people.   *Id.* at ¶ 10.   He states that HCCC has provided informational hand-outs as to COVID-19 and that detainees have space to "sit at least six feet apart."   *Id.* at ¶ 6.

Health care at HCCC is administered by Wellpath, with an on-site facility physician who is on call on a twenty-four hours basis.   *Id.* at ¶ 7.   There is an on-site infirmary, and in an effort to combat the COVID-19 outbreak, HCCC has increased medical staff, including RNs and LPNs, on site on a twenty-four-hour basis.   *Id.*

Since the onset of the COVID-19 crisis, HCCC revised its intake process.   Id. at ¶ 12. New detainees are "screened for disabilities upon admission and their temperatures are checked." *Id.* at ¶ 8.   New inmates/detainees undergo a screening, which includes a temperature check and a medical and travel history inquiry, in an external holding area.   ¶12 b i, ii.   Any person with a temperature over 100.4 degrees is denied entry and must be transported by the arresting agency to the hospital.   §12 b i.   All new inmates/detainees are placed in "lockdown" to prevent potential contamination and are not assigned to a housing unit until they are medically cleared.   *Id.*   HCCC also requires that all personnel, vendors, civilians undergo medical screening including temperature readings before admission in the facility.   *Id.* at ¶ 12 c.

HCCC was designed with air handlers and a purge system.   *Id.* at ¶ 5.   This allows the air within the facility to be re-circulated every four hours.   *Id.*   The "air handler" allows outside air into the unit when the "dampers" are open.   *Id.*   Dampers are currently open, therefore fresh air is circulated in the housing units throughout the day.   *Id.*

10

HCCC also educates detainees as to the "importance of hand washing and best practices to prevent COVID-19" and provides detainees daily access to sick call.   *Id.* at ¶ 12 d.   Detainees are each provided bars of soap, and disinfectant spray is provided to every housing unit.   *Id.* at 12 e. Additional cleaning staff have been added in order to increase the frequency of cleaning each day. *Id.*   Detainees may also request disinfectant wipes from staff.   The facility has a three-month supply of soap and disinfectant wipes.   D.E. 30 at ¶ 19.

If a detainee tests positive for COVID-19, but does not require hospitalization, he/she will be isolated in a cell in a designated isolation area.   *Id.* at ¶ 15.   Detainees who have had a known exposure to COVID-19 but who are asymptomatic are "cohorted," meaning that they are placed with other similar individuals for fourteen days.   *Id.* at ¶ 17.

### Bergen County Jail

Respondents have also submitted two declarations from the warden of Bergen County Jail, Steven Ahrendt. D.E. 20-11 31.   As of the date of Ahrendt's most-recent declaration, April 21, 2020, two ICE detainees had tested positive for COVID-19, one of which was released on March 26, 2020 and the second released from quarantine on April 13, 2020; one county inmate tested positive and is not currently housed at the jail; twenty-four correctional officers and four nurses had tested positive and were not working at the facility.   *Id.* at ¶ 9 o.

Ahrendt details the efforts of Bergen County Jail to deal with the virus.   He reports that the facility is operating far below its maximum capacity of 1,200 inmates/detainees.   *Id.* at ¶ 4. It currently houses 190 ICE detainees and 227 county inmates.   *Id.*   Ahrendt notes that Bergen County Jail has suspended all immigration detainee intake while all county inmate intake requires the inmate to undergo medical screening including fever and respiratory assessment.   *Id.* at ¶ 9 a-b.   Personnel and vendors are also required to undergo medical screening prior to entering the

facility.   Social visitation is suspended, and attorney visits are limited to visits separated by a glass partition or, alternatively, the option to conference by phone.   *Id.* at ¶ 9 c.   Ahrendt states that the facility is on "lockdown," meaning that detainees and inmates are permitted to exit their cell area, four individuals at a time, for thirty minutes each day.   *Id.* at ¶ 9 f.   This measure allows for significantly more physical space than usual to facilitate social distancing while inmates are in the recreation area or showering.   *Id.*

Health care at the facility is administered by an on-site physician (who is available twenty-four hours), as well as twelve full-time RNs and four full-time LPNs.   *Id.* at ¶ 7.   Additionally, Bergen County Jail's medical personnel includes three part-time psychiatrists as well as one full-time and one part-time dentist.   *Id.*   Due to COVID-19, the facility has additional medical staff that are on site 24 hours a day and an on-site infirmary.   *Id.*

Symptomatic detainees may be transported to either Hackensack Medical Center or Newbridge Medical Center.   *Id.* at ¶ 9 h.   Those who test positive, but who do not require hospitalization, are isolated in a cell in a unit that is exclusively being used for inmates/detainees with positive COVID-19 results.   *Id.* at ¶ 9 i.   Detainees who have had a known exposure to COVID-19 but who are asymptomatic are "cohorted," meaning that they are placed with other similar individuals for fourteen days.   *Id.* at ¶ 9 j.   Ahrendt also reports that Bergen County Jail has increased its cleaning staff in order to ensure the facility is cleaned no less than four times per day.   *Id.* at ¶ 9 l.

Among other measures instituted in response to COVID-19, Bergen County Jail educates detainees as to the "importance of hand washing and hand hygiene" and provides detainees daily access to sick call.   *Id.* at ¶ 9 m.   The facility's education on proper hygiene includes signs posted in English and Spanish.   *Id.*   Fresh air is circulated by opening windows and utilizing vents.   *Id.*

at ¶ 9 l.   Furthermore, the facility has increased its staff to allow for increased cleaning frequency. D.E. 31 at ¶ 9 l.

## II.      LEGAL STANDARD

Petitioners submit that the conditions of their confinement are in violation of their Fifth Amendment due process rights.   D.E. 16 at 33-40.

The standard for granting a temporary restraining order is the same as that for a preliminary injunction.   Injunctions and restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1.[13]   Injunctive relief may only be granted when a party demonstrates that he has a reasonable probability of success on the merits, he will suffer immediate and irreparable harm if the injunction does not issue, the grant of preliminary relief will not result in greater harm to the nonmoving party, and the injunctive relief is in the public interest.   *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001)).

Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy.   *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted); *see also In re Souels*, 688 F. App'x 134,

---

13 When considering the appealability of a recently granted TRO, the United States Court of Appeals for the Third Circuit questioned district courts' classification of some orders as TRO's, although they bore key characteristics of preliminary injunctive relief such as indefinite duration and they were entered after an adversarial hearing.   *See Hope v. Warden York Cty. Prison*, No. 20-1784 --- F.3d ---, 2020 WL 1922372 at *4 (3d Cir. Apr. 21, 2020).

135-36 (3d Cir. 2017).

### III.    DISCUSSION

The Court finds that Petitioners have not established a reasonable likelihood of success on the merits.   Before delving into the relevant analysis in this case, the Court notes the following. The Court is well aware of the seriousness of the COVID-19 pandemic, and the Court likewise recognizes that county jails and detention facilities were not designed with pandemics in mind. During the pandemic, the Court has received request for habeas relief from civil immigration detainees that fall into three general categories:   (1) detainees who do not fall into a particularly vulnerable category; (2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and (3) detainees who have tested positive for COVID-19.   As to the first category, the Court has denied relief without prejudice.   At the same time, the Court recognizes that merely because a person does not fall into a vulnerable category does not mean that he or she will not experience severe symptoms if he or she contracts the virus. The Court has denied those petitions without prejudice because information concerning COVID-19 is subject to change, and as additional information becomes available, the Court could reach a different conclusion as to those detainees who currently are not considered unusually vulnerable. As to the second category, the Court has ordered release provided that the legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by the conditions of release.   As to the third category – detainees who have the virus – the Court has found that the analysis changes.   Before a detainee contracts the virus, the public has an interest in preventing further positive cases.   In addition to the health and welfare of the detainee, the public also has an interest in seeing that scarce medical resources are conserved.   Yet, once a detainee tests positive, the public also has an interest in not introducing additional cases into the general public.   Once a

14

detainee tests positive, in the Court's view, the critical question is whether the detainee is receiving constitutionally adequate care.   As a result, once a detainee tests positive, the Court does not order release but instead remains available on short notice to address any issues that may arise as to adequacy of medical care.   To this end, the Court has inquired of facilities as to whether detainees can seek medical attention twenty-four hours a day (in case symptoms worsen) and, if necessary, how long it will take to transport a detainee to a hospital or medical center.

A.  Fifth Amendment Conditions of Confinement Claim

Petitioners are civil detainees as opposed to criminal prisoners who have been convicted and sentenced, therefore their conditions of confinement claim will be analyzed under the Due Process Clause of the Fifth Amendment, as opposed to the Eighth Amendment.   *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979).   Civil immigration detainees are entitled to the same due process protections as pretrial detainees when the conditions of confinement fall below constitutional minimums.   *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).

The Third Circuit has articulated the following relevant standards:

> To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees."

*E. D. v. Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). As a result, the Court must ascertain whether the conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose.   *Hubbard* 538 F.3d at 232.

A condition or purported deprivation amounts to punishment if the "disability is imposed for the purpose of punishment" in other words, there is "an expressed intent to punish on the part

of detention facility officials;" no "alternative purpose to which may rationally be connected is assignable for it" or is "excessive in relation to the alternative purpose assigned [to it]." *Bell*, 441 U.S. at 538 (internal citation omitted). The "inquiry into whether given conditions constitute punishment must consider the totality of circumstances within an institution." *Hubbard*, 399 F.3d at 160 (internal quotation marks and citations omitted).

District Courts have reached different conclusions when conducting this inquiry in the context of the current pandemic. In *Dawson v. Asher*, Case No. C20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020), Judge James L. Robart found that the immigration detainees did not face improper punishment. *Id.* at *2. Judge Robart explained that the petitioner's detention was reasonably related to a legitimate governmental objective because there was no evidence that the respondents intended to punish the petitioners, respondents had a legitimate governmental objective in preventing detained aliens from absconding and ensuring their appearance at removal proceedings, and the petitioners' confinement did not appear excessive in relation to the legitimate objective. *Id.*

The court in *Thakker v. Doll*, No. 20-cv-480, - F. Supp. 3d -, 2020 WL 1671563, *8 (M.D. Pa. Mar. 31, 2020), reached a different conclusion. There, Judge John E. Jones III noted that an express intent to punish was not necessary and then found that the detention in question did not bear a rational relationship to a legitimate government objective. *Id.* Judge Jones reasoned that housing immigration detainees in close proximity and in unsanitary conditions, in light of the pandemic, did not meet a legitimate governmental objective. *Id.* Judge Jones indicated that preventing aliens from absconding would constitute a legitimate governmental aim but this objective was deeply weakened in light of COVID-19, particularly when ICE had many other options to monitor civil detainees. *Id.*

16

The Court agrees with the *Thakker* court that COVID-19 alters the analysis. However, courts that have found that the conditions did not bear a rational relationship to a legitimate governmental interest in light of the pandemic, have also indicated that the individual detainee's underlying health condition weighed heavily in its analysis. *See, e.g.*, *Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, *8 (D.N.J. Apr. 9, 2020); *Thakker*, 2020 WL 1671563, *4, 6. The Court agrees that a petitioner's individual circumstances (that is, his or her medical condition) are critical to the analysis.

Respondents submit that Petitioners have not raised a valid constitutional claim. More specifically, they argue that all of the Petitioners' current detention, whether discretionary or not, is constitutional. D.E. 20 at 32-35. They further argue that Petitioners are not seeking improved conditions, but outright release, and have not demonstrated how the current confinement is excessive to the purpose of detention, especially in light of all of the measures the facility is taking to address the issue. *Id.* at 36-42.

The record reflects that both facilities in question have responded to this pandemic and continue to respond to this pandemic. The Court notes that many of the declarations submitted by former detainees, are from those who were released in late March of 2020. However, the Court would be remiss to not acknowledge the COVID-related changes implemented since mid-late March, as documented in declarations from the facility directors.

Petitioners maintain that the care they are receiving at the jails is inadequate and direct the Court's attention to a report from Dr. Laura Krinsky, MD, a physician based in Seattle, Washington, who reviewed all four Petitioners' medical files but has not personally treated (or seen) Petitioners. Dr. Krinsky's opinion suggests, among other things, that Elmer R.M. and Bairon G.M. may be positive for COVID-19 in light of their symptoms. D.E. 32-1.

17

The record reflects that Elmer, in particular, has been seen for a number of maladies unrelated to COVID-19 including dental pain, acne, athlete's foot, seasonal allergies, and has been seen on more than a weekly basis.   D.E. 20-6.   The Court credits Elmer's voluminous medical records, which are a part of the record, that reflect the facility's ongoing evaluation and treatment of Elmer's variety of concerns.   *Id.*   Also, critical, the medical records directly undercut Elmer's allegations concerning the medical attention that he has received.   D.E. 16 at ¶ 75.

Bairon submits that his requests for medical care were repeatedly dismissed and even his first COVID-19 test report is inconclusive.   D.E. 28 at 22-24.   Bairon was tested for COVID-19 on April 16, 2020.   Nonetheless, he argues that he was not told "why a cotton swab was being put up his nose" when the test was being administered, nor, was his temperature taken or his symptoms assessed at that time.   D.E. 28 at 12-13.   The first test report dated April 17, 2020, provides that Bairon's COVID-19 test result did not indicate anything abnormal and that the results were "to follow."   D.E. 26 at 3.   Bairon argues that even if his results were reported as negative, he was administered a nasal swab for the real-time reverse transcription polymerase chain reaction (ET-PCR) test, which studies report have a thirty percent false-negative result rate.   D.E. 28 at 23. Bairon's final report dated April 20, 2020, states that COVID-19 is "not detected."   D.E. 31 at 2. Based on the current record, the Court concludes that neither Elmer nor Bairon has sufficiently demonstrated that he has COVID-19.

Elmer and Bairon's young age, twenty-five and twenty-two respectively, and the absence of an underlying health condition[14] do not support the notion that they may be particularly

---

14 Elmer's attorney, in an affidavit dated April 26, 2020, submits for the first time, that his client "is a long-time daily smoker and obese."   D.E. 32-5 at ¶ 13.   Petitioner's medical records are silent as to his smoking history and document his height and weight as of April 2020, as 65 inches (approximately 5'4") and 170 pounds.   D.E. 20-6 at 4.   Dr. Krinsky also submits that because

18

susceptible to the virus.   As a result, neither have shown that the legitimate governmental interest has been overcome.

As for Petitioners Erlin P.M. and Everod R., they have both tested positive for COVID-19 since the instant matter originated.   The Court, therefore, no longer sees the matter, as it relates to them, as one of prevention but rather one of sufficient care.   To the extent that Erlin and Everod are dissatisfied with the level of care since their positive test results, the Court does not find that either Petitioner has demonstrated that jail officials have acted in a manner that would reach the level of unconstitutional punishment under the Fifth Amendment.[15]

The record reflects that both Erlin and Everod were tested for COVID-19 on April 16,

---

Elmer's body mass index ("BMI") is greater than or equal to 30, he may be at risk for hospitalization and care for COVID-related complications.   D.E. 32-1 at 4.   Elmer, however, cannot amend his petition in his brief.   *See Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).   The Court further notes the Respondent's argument that the Centers for Disease Control's ("CDC") COVID-19 risk factors lists *severe* obesity, which is qualified as a BMI greater than *or equal to 40*.   D.E. 33 at 2 (emphasis added).   *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 29, 2020).

15 Because the current pandemic represents unchartered territory in recent jurisprudence, the parties are understandably drawing from analogous situations.   One of those situations is cruel and unusual punishment under the Eighth Amendment, which applies a deliberate indifference standard to medical treatment (or lack thereof). *See*, e.g., *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkelll v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017); *King v. Cnty. Of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008).   "To act with deliberate indifference to serious medical needs, is to recklessly disregard a substantial risk of serious harm." *Harvey*, 263 F. App'x at 191 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

However, the Court finds that the Eighth Amendment is not applicable because Petitioners are not convicted criminal inmates but civil immigration detainees.   As noted, the Court evaluates the Petitioners' claims under the Due Process Clause of the Fifth Amendment, which prohibits "punishment" of a civil detainee.   *See Natale*, 318 F.3d at 581; *see also Hubbard v. Taylor*, 399 F.3d 150, 157-60 (3d Cir. 2005).   As a result, the Court finds that the deliberate indifference standard merely sets the floor, and not necessarily the ceiling, of constitutionally required medical care in this matter.

2020, and received their positive results a day later.   Erlin submits that jail officials administered the COVID-19 test without taking his vitals or assessing his symptoms.   D.E. 28 at 8.   Erlin and Everod also appear to take umbrage with a corrections officer advising them of their positive test results rather than a medical professional, and that they were mistakenly informed that they would be released from detention.   *Id.* at 18.   They also insist that they have not been adequately treated since the results were reported.   *Id.* at 22.   Respondents do not deny that both Petitioners were misinformed that they would be released.   D.E. 30 at 1.   However, Respondents, rebut that both individuals are being monitored by the medical and mental health staff several times a day and that they are both in isolation.   D.E. 30 at 1, 33-2, 33-3.

Petitioners' medical expert, Dr. Krinsky, speculates that Erlin may have tuberculosis ("TB"), in part due to him being a native of El Salvador, and may therefore be susceptible to more severe progression of the COVID-19 virus.   Elmer's medical records document his most-recent annual PPD and CXR test for TB on December 20, 2019, which were negative.   D.E. 25-6 at 11. Dr. Krinsky also submits that Everod's history of schizophrenia may further exacerbate the progression of COVID-19.   D.E. 32-1 at 7.   Respondents counter that mental conditions such as schizophrenia are not among the conditions identified by the Centers for Disease Control ("CDC") as a COVID-19 risk factor.   D.E. 33 at 6.   *See Lopez-Marroquin v. Barr*, Civil No. 20-682- LAB, 2020 WL 1905341, *5 (S.D. Cal., Apr. 17, 2020) (addressing detainee's schizophrenia in context of current pandemic).   Moreover, Respondents direct the Court's attention to Everod's documented history of not being compliant with his mental health medication protocol.   *Id.* at 7.

In *Camacho Lopez v. Lowe,* No. 3:20-563, 2020 WL 1689874 (M.D. Pa., Apr. 7, 2020), the district court did not find deliberate indifference by jail administration when a detainee tested positive for COVID-19 and whose condition further deteriorated.   The district court further noted,

20

"while he is legally detained, Camacho Lopez is isolated from society at large, restricted from spreading this highly contagious virus within the community, and receiving appropriate medical care." *Id.* at *8. *See also Umarbaev v. Lowe*, Civ. Action No. 1:20-00413, 2020 WL1814157 (M.D. Pa., Apr. 9, 2020) (denying medically quarantined immigration detainee's request for release). Unlike the petitioner in *Camacho Lopez*, neither Everod nor Erlin have alleged that their conditions have deteriorated since the COVID-19 positive test results. Moreover, the information from Respondents reflects that both are being seen on a daily basis, during which their subjective complaints are recorded and their vital signs along other relevant testing (such as temperature) are reviewed and documented. Accordingly, Petitioners Erlin and Everod have not shown a likelihood of success on the merits.[16]

In conclusion, the Court does not find that Petitioners Elmer R.M., Everod R., Bairon G.M., and Erlin P.M. are likely to succeed on their claims. Petitioners' request for a TRO is thus denied.

**IV.     Conclusion**

The Court denies without prejudice the request for a temporary restraining order D.E. 17. An appropriate Order accompanies this Opinion.

Dated: 4/30/2020

JOHN MICHAEL VAZQUEZ
United States District Judge

---

16   However, as noted, the Court remains available on short notice should either Everod or Erlin believe that he is not receiving constitutionally adequate care.

21